In re John P. SHEPPARD, Debtor.

John P. Sheppard and Susan
M. Sheppard, Plaintiffs,

v.

GMAC Mortgage Corp., Defendant.

Bankruptcy No. 02–15674DWS.
Adversary No. 02–1109.

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 6, 2003.

David A. Scholl, Regional Bankruptcy Center, Law Office of David A. Scholl, Newtown, PA, Counsel for Plaintiffs.

Kevin M. Toth, Reed Smith, LLP, Philadelphia, PA, Counsel for Defendant.

William C. Miller, Philadelphia, PA, Standing Chapter 13 Trustee.

Dave P. Adams, Office of the U.S. Trustee, Philadelphia, PA, United States Trustee.

## OPINION

DIANE WEISS SIGMUND,
Bankruptcy Judge.

Before the Court is the Motion of GMAC Mortgage Corp. ("GMAC") for

Summary Judgment (the "Motion") on the Complaint of the Debtor, John P. Sheppard and his non-debtor wife, Susan Sheppard (collectively, the "Plaintiffs"). For the reasons stated herein, the Motion is granted.

## FACTUAL AND PROCEDURAL BACKGROUND

On or about September 28, 1990, Plaintiffs received a $160,000 loan from GMAC secured by a mortgage on Plaintiffs' residence (the "Original Loan"). Compl. & Answer ¶ 5.[1] Plaintiffs subsequently fell into arrears on the Original Loan and GMAC instituted foreclosure proceedings. Deposition Transcript of John P. Sheppard ("J. Sheppard Dep.") at 29. To avoid foreclosure, Plaintiff John Sheppard filed a prior Chapter 13 case, *In Re John Sheppard,* No. 99–15003 (the "First Bankruptcy"). J. Sheppard. Dep. 29–30. The First Bankruptcy was subsequently dismissed upon motion of the Chapter 13 Trustee. Though the time line is unclear, it appears that Plaintiffs had been talking to numerous individuals at GMAC by telephone to discuss alternatives to foreclosure and ultimately talked to a GMAC representative named Cindy Barrett. J. Sheppard Dep. at 27, 30–32; Deposition Transcript of Susan M. Sheppard ("S. Sheppard Dep.") at 6–7.[2] Ms. Barrett had sent the Plaintiffs a form titled "Plans that May Be Available to You" that outlined various options offered to borrowers by GMAC generally. Exhibit D to J. Sheppard Dep.; J. Sheppard Dep. at 36–37. Under her guidance, they sent a letter to GMAC ask-

---

1. The record on summary judgment consists of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any. Fed.R.Civ.P. 56(a) (incorporated herein by Fed.R.Bankr.P. 7056). Plaintiffs objected to GMAC's attached excerpts of their deposition testimony for lack of completeness, which they have cured by providing the entire deposition transcripts and exhibits thereto. Appendix A to Plaintiffs' Memorandum of Law in Opposition to Motion ("Plaintiff's Mem."). GMAC's appendix of exhibits also contains various documents that were not supported by an affidavit or certification. "As is true with other material introduced on a summary judgment motion, uncertified or otherwise inadmissible documents may be considered by the court if not challenged." 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 2722, at 384 (1998). *Accord In re Unisys Savings Plan Litigation,* 74 F.3d 420, 437 n. 12 (3d Cir.1996) ("We agree with our ... sister courts of appeals that Rule 56 defects are waived where they are not raised in the district court."). However, Plaintiffs have raised an evidentiary objection, Plaintiffs' Mem. at 2, and thus I will not consider Exhibits A–D, F, J, and M which have not been authenticated.

Any factual findings herein are based upon the stipulated record (namely Plaintiffs' deposition transcripts and exhibits, if any), my own knowledge of the procedural history, and other judicially noticeable facts such as the dockets in Debtors' bankruptcy cases. Fed.R.Evid. 201, incorporated in these proceedings by Fed.R.Bankr.P. 9017. *See Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); *Levine v. Egidi,* 1993 WL 69146, at *2 (N.D.Ill.1993); *In re Paolino,* 1991 WL 284107, at *12 n. 19 (Bankr.E.D.Pa.1991); *see generally In re Indian Palms Associates, Ltd.,* 61 F.3d 197 (3d Cir.1995). While a court may not take judicial notice *sua sponte* of facts contained in the debtor's file that are disputed, *In re Aughenbaugh,* 125 F.2d 887 (3d Cir.1942), it may take judicial notice of adjudicative facts "not subject to reasonable dispute ... [and] so long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority." *In re Indian Palms Assoc.,* 61 F.3d 197, 205 (3d Cir.1995) (citing Fed. R.Evid. 201(f) advisory committee note (1972 proposed rules)). Moreover, "factual assertions in pleadings, which have not been superceded by amended pleadings, are judicial admissions against the party that made them." *Larson v. Groos Bank,* 204 B.R. 500, 502 (W.D.Tex.1996) (statements in schedules).

2. It appears that Mr. Sheppard had the primary contact with Ms. Barrett. Mrs. Sheppard sat through some but not all of the conversations. S. Sheppard Dep. at 6–7.

ing GMAC to provide one of two options mentioned in the form, *i.e.*, a repayment loan or modification plan, in order to save their home. Exhibit E to J. Sheppard Dep.

Ultimately Plaintiffs' discussions with Ms. Barrett led to GMAC proposing a five paragraph "Loan Modification Agreement" (the "Modification") in recordable form to "amend and supplement" the Mortgage, Deed of Trust or Deed to Secure Debt ("Security Instrument") dated September 28, 1990, in the original principal sum of U.S. $160,000" and the Note of the same date secured by the Security Instrument. Exhibit A to Compl. The relevant agreements set forth in the Modification are as follows:

(1) "As of July 1, 2000, the amount payable (the 'Unpaid Principal Balance')" of the Original Loan is $216,065.17, "consisting of the amount(s) loaned to the Borrower by the Lender and any interest capitalized to date;"

(2) the Borrower promises to pay the Unpaid Principal Balance plus interest by making "monthly payments of principal and interest of U.S. $2,077.01" beginning August 1, 2000 until principal and interest are paid in full; [3]

(4) Plaintiffs will "comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, the Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that the Borrower is obligated to make under the Security Instrument;"

(5) "Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Agreement. except as otherwise specifically provided in this Agreement, the Note and Security Agreement will remain unchanged, and the Borrower and Lender will be bound by and comply with, all of the terms and provisions thereof, as amended by this Agreement."

Exhibit A to Compl. A footnote to the "Unpaid Principal Balance" states "Capitalized Amount $62,510.08." The explanation for this amount is allegedly set forth in a letter from GMAC to Plaintiffs dated August 16, 2000, attached as Exhibit B to Plaintiffs' Memorandum, which the Plaintiffs state they never received.[4]

3. After the Modification was executed and shortly after payments began, the monthly amount was increased to $2,350 to add an escrow amount. While the Plaintiffs do not dispute their knowledge of the monthly payment increase to $2,077.01 in the Modification, they were not advised prior to executing the Modification that the additional approximately $300 escrow would be required. J. Sheppard Dep. at 67; S. Sheppard Dep. at 12. It is not clear if Plaintiffs are alleging that the increase in the payment to include the escrow is part of the UDAP violation, and if so, how and why.

4. The unauthenticated letter breakdowns the increase to the principal amount of the Original Loan as consisting of interest arrears ($61,305.85), escrow shortage ($11,708.67), foreclosure fees and costs ($7,222.41), modification fee ($500.00) and inspections/preservation ($226.50) and totaling $80,963.43 of which $62,510.08 is "capitalized" and $18,453.35 due to be paid with the signed Modification. Mrs. Sheppard acknowledges the payment of approximately $18,000 made with the Modification and that the increase in principal was to cure arrearages but contends they requested but never received a breakdown of the increase in principal amount. S. Sheppard Dep. at 17. As Plaintiffs have challenged the evidentiary sufficiency of this document and as there is no evidence in this record as to who or when the letter was created or when or if it was sent, I do not rely on its contents to establish the components of Plaintiffs' obligation under the Modification. Had it been necessary to reach GMAC's alter-

According to Plaintiffs, the Modification did not in any way represent what they had discussed with Ms. Barrett. J. Sheppard Dep. at 48–49, 51–52; S. Sheppard Dep. at 8–10. According to Mrs. Sheppard, she was expecting a balloon payment or a loan extension of another ten years. S. Sheppard Dep. at 9. As a result, Mr. Sheppard called Ms. Barrett and told her he was not happy with the proposed Modification and could not agree to its terms. J. Sheppard Dep. at 48–49. Ms. Barrett told him that this was the best GMAC was willing to offer, notwithstanding what other, different representations may have previously been made. J. Sheppard Dep. at 49–50; S. Sheppard Dep. at 10–12.

Mr. Sheppard alleges that Ms. Barrett then told him the payments called for by the Modification would only be for one year, after which the loan would be refinanced at current rates. J. Sheppard Dep. at 61–62.[5] Such a term is not in the Modification, a fact that Mr. Sheppard understood at the time of his discussion with Ms. Barrett and a fact which greatly concerned him at the time. J. Sheppard Dep. at 54–55; 62–64. His request that a subsequent commitment to refinance be included in the Modification was rejected by Ms. Barrett, albeit for reasons which did not satisfy Mr. Sheppard. He described his impression of that conversation: "I was in a position of an untrustworthy sense in my gut," *id.* at 57; "the whole conversation was of great concern to me," *id.* at 63; "I was losing faith in [Ms. Barrett] as every second ticked along," *id.* at 77. However, with GMAC offering no alternatives other than to exercise its foreclosure remedy, the Plaintiffs felt they had no other option in the face of their payment defaults but to agree to its terms. After discussion, they signed the Modification, albeit grudgingly. J. Sheppard Dep. at 64–66; S. Sheppard Dep. 11–12.[6]

native argument that the exception of 12 C.F.R. § 226.20(a)(4) applies, I would not have the evidence to do so notwithstanding the various documents appended to GMAC's Memorandum of Law in Support of Motion ("GMAC Mem.").

5. Mrs. Sheppard was visiting relatives when her husband received the Modification via Federal Express and when he discussed it with GMAC. S. Sheppard Dep. at 8. Her testimony, while hearsay as to Mr. Sheppard's telephone discussion with GMAC, is nevertheless probative of her understanding of the Modification. Moreover, she did return home, read the Modification, and signed it. S. Sheppard Dep. at 11–12.

6. On this point, -Mr. Sheppard responded as follows:

Q: And when it was over, you did end up signing the agreement, didn't you?
A: Not right away.
. . .
A: Probably late that night.
Q: After you had a chance to think about it?

A: Stew over it is more the term that I like to say.
Q: But in the end, you decided to sign the agreement?
A: In the end, I believe after conversing with my wife that we had to.

Mrs. Sheppard's testimony comports with her husband's:

[John] told me what [Ms. Barrett] said about, this is it. This is the best we can do. Sign it, or you lose your house within two weeks. I said, we have to sign it. He said we don't. We argued back and forth. And as he stated earlier, he didn't sign it until late that night.

S. Sheppard Dep. at 11–12. While Mr. Sheppard's testimony characterizes his consent to the Modification as "forced" or "under duress," J. Sheppard Dep. at 48–49, 77, it is clear that he does not mean duress in the legal sense but rather that Plaintiffs' financial circumstances and the immediacy of the circumstances prompted his signature. GMAC only gave them twenty-four hours to consider the Modification and no other alternatives. *Id.* Trans. The Complaint does not allege duress as a legal basis for voiding the Modification.

Plaintiffs made the increased payments required by the Modification for eleven to twelve months until Mrs. Sheppard became ill, after which Plaintiffs once again fell behind. J. Sheppard Dep. at 68. On April 12, 2002, Plaintiffs filed the instant bankruptcy to prevent GMAC's sheriff's sale of their home. Compl. & Answer ¶ 13. By letter dated May 1, 2002, Plaintiffs' (through counsel) informed GMAC that they were exercising their purported right to rescind the Modification. *Id.;* Exhibit B to Compl. By letter dated May 15, 2002, GMAC (through counsel) denied Plaintiffs' right to rescission. Compl. & Answer ¶ 14; Exhibit C to Compl. Plaintiffs thereafter filed the instant adversary proceeding, alleging violations of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* (Count I) and violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Act, 73 P.S. § 201–1 *et seq.* (Count II). GMAC asserts that it is entitled to summary judgment on both counts. For the reasons stated below, I concur.

**DISCUSSION**

*I.*

A motion for summary judgment is governed by Federal Rules of Civil Procedure ("Fed.R.Civ.P.") 56 applicable in this proceeding pursuant to Federal Rule of Bankruptcy 7056. Summary judgment, "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The party moving for summary judgment must overcome the initial burden of demonstrating the absence of a material question of fact. *Celotex v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The substantive law will de-termine which facts are material. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Id.* at 255, 106 S.Ct. 2505. A court must find that the motion alleges facts which, if proven at trial, would require a directed verdict. 6 J. Moore, *Moore's Federal Practice,* ¶ 56.26 (2d ed.1988). If so, the respondent "must set forth specific facts showing there is a genuine issue for trial," and may not "rest upon the mere allegations or denials of the pleading." Fed. R. Civ P. 56(e). If the non-movant's evidence "is merely colorable, or is not significantly probative, summary judgement may be granted." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. However, as it is the moving party's burden to demonstrate the absence of genuine issues of material fact, even if the opposing party fails to file contravening affidavits or other evidence that establishes a genuine issue of material fact, summary judgment must still be warranted and will be denied where the movant's own papers demonstrate the existence of material factual issues. *Drexel v. Union Prescription Centers, Inc.,* 582 F.2d 781, 790 (3d Cir.1978) (*citing Adickes v. S.H.Kress & Co.,* 398 U.S. 144, 159–61, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (citations omitted)). *See Maldonado v. Ramirez,* 757 F.2d 48, 51 (3d Cir.1985). The absence of a genuine issue for trial is evident where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). With this standard in mind, I address the Complaint.

*II.*

■ Count I of the Complaint seeks

rescission of the "transaction,"[7] as well as damages stemming from GMAC's alleged failure to honor Plaintiffs' May 1, 2002 exercise of rescission pursuant to the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA"). TILA is a federal statute governing the terms and conditions of consumer credit. Its purpose is to aid unsophisticated consumers lest they be easily misled as to the costs of financing. *Shepeard v. Quality Siding & Window Factory*, 730 F.Supp. 1295, 1299 (D.Del.1990) (*quoting Thomka v. A.Z. Chevrolet*, 619 F.2d 246 (3d Cir.1980)). To that end, it and the regulations promulgated thereunder require certain disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uniformed use of credit[.]." 15 U.S.C. § 1601(a).

In 15 U.S.C. § 1604, Congress authorized the Federal Reserve Board to "prescribe regulations to carry out the purposes" of the TILA. Pursuant to this authority, the Federal Reserve Board promulgated "Regulation Z" which is memorialized in 12 C.F.R. Pt. 226. *Rossman v. Fleet Bank (R.I.) National Association*, 280 F.3d 384, 389 (3d Cir.2002). The Board "also published extensive 'Official Staff Interpretations.' 12 C.F.R. Pt. 226 Supp. I." *Id.* As the Third Circuit noted in *Ortiz v. Rental Management, Inc.*, 65 F.3d 335 (3d Cir.1995), "the Supreme Court has emphasized the broad powers that Congress delegated to the Board to fill gaps in the statute." *Id.* at 339. The Supreme Court has instructed that "[c]ourts should honor that congressional choice. Thus, while not abdicating their ultimate judicial responsibility to determine the law ... judges ought to refrain from substituting their own interstitial lawmaking for that of the Federal Reserve, so long as the latter's

lawmaking is not irrational." *Ford Motor Credit Company v. Milhollin*, 444 U.S. 555, 568, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980). Discussing this same point in *Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981), the Supreme Court stated that "absent some obvious repugnance to the statute," Regulation Z "should be accepted by the courts, as should the Board's interpretation of its own regulation." In analyzing the Debtor's contentions, my guideposts are therefore the statutory provisions of the TILA as well as Regulation Z and the Official Staff Interpretations.

Here Plaintiffs seek rescission based upon GMAC's uncontested failure to provide the requisite TILA disclosures. They do not allege that GMAC failed to provide the requisite notice of right to rescission and TILA disclosures with regard to the Original Loan, but rather with respect to the Modification transaction, which increased their loan obligation by $62,000 after they had paid $18,000 which they believed was sufficient to cure their pending delinquency. Averring no knowledge of the basis of the new amount, they argue it must be characterized as a "new amount financed" for which they were entitled to new TILA disclosures. Compl. ¶ 10–12, 16–18.

Generally events subsequent to a consumer loan transaction do not affect the validity of the initial disclosures or require the creditor to make further disclosures. 15 U.S.C. § 1634. The regulations, however, do define certain narrow circumstances where further disclosure is mandated. They include certain residential mortgage and variable rate transactions, 12 C.F.R. § 226.19; refinancings, assumptions, and variable rate adjustments, 12 C.F.R. § 226.20; and circumstances

---

7. The transaction presumably refers to the Modification.

where early disclosures are rendered inaccurate prior to the date of consummation, 12 C.F.R. § 226.17(f). *Begala v. PNC Bank, National Association,* 163 F.3d 948, 950 (6th Cir.1998). Plaintiffs contend that the Modification is a refinancing requiring subsequent disclosure.[8]

While GMAC disagrees with Plaintiffs' characterization, the parties do agree that the relevant starting point to determine whether a transaction is a refinancing is Regulation Z, 12 C.F.R. § 226.20(a) which provides in pertinent part:

> (a) Refinancings. A refinancing occurs when an existing obligation that was subject to this subpart is satisfied and replaced by a new obligation undertaken by the same consumer. A refinancing is a new transaction requiring new disclosures to the consumer.... The following shall not be treated as a refinancing:
>
> . . .
>
> (4) A change in the payment schedule or a change in collateral requirements as a result of the consumer's default or delinquency, unless the rate is increased, or the new amount financed exceeds the unpaid balance plus earned finance charge and premiums for continuation insurance of the types described in § 226.4(d).

. . .

12 C.F.R. § 226.20(a) (subsections (1)-(3) and (5)omitted). I concur.

▇ The Federal Reserve Board's interpretation of this provision reaffirms its straightforward language:

> A refinancing is a new transaction requiring a complete new set of disclosures. Whether a refinancing has occurred is determined by reference to whether the original obligation has been satisfied or extinguished and replaced by a new obligation, based on the parties' contract and applicable law. The refinancing may involve the consolidation of several existing obligations, disbursement of new money to the consumer or on the consumer's behalf, or the rescheduling of payments under an existing obligation. *In any form, the new obligation must completely replace the prior one.*

Official Staff Interpretation to 12 C.F.R. § 226.20(a) (12 C.F.R. Pt. 226, Supp. I) (emphasis added). Thus, the plain language of the regulation and the interpretation of its promulgators make clear that a refinancing requires a satisfaction or extinguishment of the original obligation by the new obligation.[9]

---

8. Though the term "refinancing" is not used in the Complaint, Plaintiffs invoke 15 U.S.C. § 1635(e)(2) which allows rescission of a refinancing from the same creditor to the extent that there are any new advances. *See* 12 C.F.R. § 226.23(f)(2) and Official Staff Interpretation, 12 C.F.R. Pt. 226, Supp. I. Moreover, GMAC in its Motion understands the Complaint to seek rescission on the ground that the Modification Agreement was a "refinancing" which generated new disclosure obligations on the part of GMAC, and Plaintiffs' response to the Motion evidences the same premise. Plaintiffs' Mem. 5–8 ("C. THE AGREEMENT IS A REFINANCING OF THE BORROWERS' MORTGAGE BECAUSE THE AMOUNT FINANCED EXCEEDS THE UN-

PAID BALANCE PLUS EARNED FINANCE CHARGES AND INSURANCE COSTS").

9. Notably § 226.20(a) superceded 12 C.F.R. § 226.8(j) which contained a broader definition of refinancing:

> If any existing extension of credit is refinanced, or two or more existing extensions of credit are consolidated, *or an existing obligation is increased,* such shall be considered a new transaction subject to the disclosure requirements of this part.

12 C.F.R. 226.8(j) (rescinded in 1982) (emphasis added). Explaining the new § 226.20, the Official Board Interpretation states:

> *1981 changes:* While the previous regulation treated virtually any change in terms as a refinancing requiring new disclosures,

Plaintiffs focus on one of the five subsections following § 226.20(a), namely subsection four, as the "controlling definition" of a refinancing. *See supra.* This argument is flawed as is apparent from the Federal Reserve Board's commentary on the exceptions:

2. *Exceptions.* A transaction is subject to § 226.20(a) only if it meets the general definition of a refinancing. Section 226.20(a)(1) through (5) lists 5 events that are not treated as refinancings, even if they are accomplished by cancellation of the old obligation and substitution of a new one.

Official Staff Interpretation to 12 C.F.R. § 226.20(a) (12 C.F.R. Pt. 226, Supp. I). Thus, to determine whether a transaction is a refinancing, one must first apply the definition of refinancing in § 226.20(a) of Regulation Z and the Official Staff Interpretations to the transaction at issue. If the result of that analysis is that the transaction is a refinancing, one of the five exceptions may be applicable to except the transaction from the disclosures required of a refinancing. However, if the transaction is found not to be a refinancing when applying the general definition, the exceptions are not implicated. Stated another way, the exceptions are applied to transactions first found to be refinancings. The issue therefore becomes whether the Modification was a refinancing.[10]

■ A review of the Modification evidences no language indicating that the Modification replaces the Original Loan but rather suggests that it does not. The Modification begins with a preamble that it "amends and supplements" the mortgage and note of the Original Loan. Exhibit A to Complaint at 1. Paragraph 4 specifically requires Plaintiffs to continue to comply with all the other requirements of the Original Loan (except any term relating to an adjustment of interest under the Note or any adjustable rate rider affixed to the Note) including payment of taxes, insurance premiums, escrow items and all other payments required by the original loan documents. *Id.* at 2, ¶ 4. Finally, the Modification ends with the express disclaimer that the Modification is not a satisfaction of the Original Loan which remains unchanged except as modified and that the parties are bound by the terms and provisions of the Original Loan as amended by the Modification. Exhibit A to Compl. at 2, ¶ 5. Thus, while the principal amount increased, the interest rate and loan term remain unchanged. J. Sheppard Dep. at 60.

Plaintiffs argue that the addition of $62,510.08 to their Original Loan amount, in addition to their decade of payments and the money they paid in connection with the Modification Transaction essentially "replaced" the Original Loan with a new obligation, notwithstanding that the original mortgage was not "satisfied." Plaintiffs' Mem. at 6. As a factual matter, this argument is somewhat disingenuous in that it ignores the reality of which Plaintiffs were aware, that they were in arrears on the Original Loan, and the Modification was intended to cure the default occasioned by those arrears which were part of the original obligation. As best as I can

this regulation limits refinancings to transactions in which the entire original obligation is extinguished and replaced by a new one.

Official Staff Interpretation to 12 C.F.R. § 226.20. References. (12 C.F.R. Pt. 226, Supp. I).

10. Because I find that the Modification does not meet the basic definition of a refinancing in § 226.20(a), I need not address the parties' respective positions on whether the Modification falls within one of the exception set forth in § 226.20(a)(4), something which would have been difficult to do on this record.

understand Plaintiffs' argument, they believe the failure of GMAC to explain the "capitalized amount of $62,510.08" set forth in the Modification requires that such amount be considered a new advance and that such new advance be deemed a refinancing. Complaint ¶ 12. No authority is advanced for this proposition.

More importantly, Plaintiffs provide no authority from this circuit or any other to refute the considerable circuit and lower court decisions that have found the language of Regulation Z to be clear: "In any form, the new obligation must completely replace the prior one." Official Staff Interpretation to 12 C.F.R. § 226.20(a) (12 C.F.R. Pt. 226, Supp. I). *See also Jackson v. American Loan Company, Inc.*, 202 F.3d 911, 912 (7th Cir.2000); *Begala v. PNC Bank*, 163 F.3d 948, 951 (6th Cir. 1998); *Hubbard v. Fidelity Federal Bank*, 91 F.3d 75, 79 n. 8 (9th Cir.1996); *Adams v. GMAC Mortgage Corp.*, 1994 WL 702639, at *6 (N.D.Ill.1994); *Hart v. GMAC Corp.*, 246 B.R. 709, 738 (Bankr. D.Mass.2000) (all construing the definition of refinancing in 12 C.F.R. § 226.20 and its Official Staff Interpretation as requiring satisfaction and replacement of the old obligation by the new obligation).

Plaintiffs dismiss the above-cited cases as "factually inapposite." Plaintiffs' Mem. at 6–7.[11] It is true that none of these cases involve an increase in the principal amount of the loan to include capitalized interest. However, the factual differences in the transactions at issue in those decisions do not undermine the basic principle underlying their outcome, *i.e.*, in determining whether a transaction is a refinancing under § 226.20(a), courts look to whether the existing obligation was satisfied and replaced by a new obligation. For example, the Seventh Circuit Court of Appeals in *Jackson, supra*, quoting the Official Staff Commentary with regard to changes in the terms of an existing obligation states:

> The rule stated by the Commentary is that only "the cancellation of [the original] obligation and the substitution of a new obligation amount to a refinancing."

202 F.3d at 912. In *Hart, supra*, the debtor argued that there was no rational purpose for having a creditor's disclosure obligation turn on whether the existing obligation is replaced by a new obligation contending such a reading of § 226.20 would exempt all workouts. 246 B.R. at

11. Plaintiffs' sole proffered support for their contrary view is the unpublished and equally factually inapposite decision in *Hogan v. Valley National Financial Services Co.*, No. 94–C–1418, slip op. at 6–8 (D.Colo. Feb. 6, 1995) (attached as Appendix E to Plaintiffs' Mem.). In *Hogan*, the plaintiff alleged that the lender's forced-placement of finance premiums for insurance outside the scope of the contract's authorization constituted a new loan. While the defendant argued that the parties' contract expressly authorized the purchase so as not to be a triggering subsequent event, the factual allegations had to be assumed true for the purpose of the motion to dismiss before the court. Based on the allegation that the purchase was not authorized by the contract, the defendant had not met its burden to prove that there was no set of facts in support of his theory that the forced-placed insurance out-

side the scope of the contract's authorization constituted a new loan requiring new disclosure. Notably, unlike the Plaintiffs here, the plaintiff did not contend that the purchase of the insurance was a refinancing but rather a new loan. Moreover, it is unlikely that such a scenario would have survived a motion to dismiss if the purchase had been found to have been authorized by the contract. In *Adams, supra*, the parties' agreement required the plaintiff to maintain insurance and upon her failure to do so, allowed the defendant to fulfill her obligation and charge her for the cost of the premiums. In this case, the purchase of hazard insurance was found not to be a refinancing. The court found the plaintiff had failed to identify an existing credit obligation that was satisfied or extinguished nor any new obligations replacing existing ones. 1994 WL 702639, at *5.

737. The Court disagreed, expressly rejecting the debtor's "invitation to add a judicial gloss to TILA and Regulation Z." Applying the plain language of TILA, Regulation Z and the Official Staff Interpretation as I must, I too decline Plaintiffs' invitation to broaden the reach of the disclosure requirement attendant to a loan modification that does not satisfy and replace the original obligation.

There is simply no question of fact that the Modification did not satisfy the Original Loan, as even Plaintiffs concede. Only where the original loan is satisfied and a new obligation is created, i.e., a refinancing, are new disclosures required. As the Modification does not meet the basic definition of "refinancing," Plaintiffs were not entitled to TILA disclosures for that transaction. GMAC is entitled to summary judgment on Count I of the Complaint.

### III.

Like most of her sister states, Pennsylvania has adopted a statute which prohibits "unfair or deceptive acts and practices," specifically the Unfair Trade Practices and Consumer Protection law, 73 P.S. § 201–1, et seq. (referred to hereinafter as the "UDAP"). The UDAP prohibits the use of unfair or deceptive acts and practices in the conduct of any trade or commerce, 73 P.S. § 201–3, and it specifically enumerates twenty-one prohibited types of conduct. 73 P.S. § 201–2(4)(i)–(xxi). It is this provision which Plaintiffs invoke, contending that the Modification was "tainted with fraud" in violation of § 201–2(4)(v), (vii), (xv) and (xxi) and entitling them to damages and attorneys' fees. Compl. ¶ 20–22.[12]

The UDAP provisions relied upon by Plaintiffs are the specific types of "unfair or deceptive acts or practices" identified in subsections (v) ("Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have"); (vi) ("Representing that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand"); (vii) (Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another); (xv) (Knowingly misrepresenting that services, replacements or repairs are needed if they are not needed) as well as the general catchall provision set forth in subsection (xxi) which prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding" (the "Catchall").

■ I concur with GMAC in finding absolutely no basis in the facts of record to support violations of subsections (vi), (vii) and (xv). Indeed Plaintiffs make no attempt to connect the factual record with any of the conduct prohibited by these sections which address entirely different issues. Neither do Plaintiffs explain how GMAC's actions violated subsection (v). However, making the connection for Plaintiffs that they have failed to make for subsection (v), I will assume their reliance on this provision stems from Ms. Barrett's representations about the characteristics of the Modification which it ultimately did

---

**12.** While not demanded in the prayer for relief for this Count, the Complaint avers that the "Agreement (i.e., Modification) must be revised to reflect the parties' actual agreement." Compl. ¶ 20. As correctly noted by GMAC, the only remedy available under the

UDAP is actual damages, which may be trebled, and possibly costs and attorneys' fees. To the extent that Count II seeks the equitable relief of reforming the contract, such relief is simply not available under the statute.

not have. The problem, of course, with this argument (if indeed that is the argument) is that the Modification did *not* have these characteristics when it was accepted and Plaintiffs were well aware of that fact. It is undisputed that Plaintiffs read the Modification and were fully aware that its terms did not comport with the prior discussions. Indeed, they were outraged and immediately called Ms. Barrett to discuss the disparity between the Modification and what she had led them to believe would be forthcoming. They referenced discussions about putting the arrears at the back end of the loan and lowering the interest rate and noted the absence of those provisions in the Modification. Ms. Barrett's response was short and to the point: she refused to alter the terms of the Modification advising them that the terms were the "best GMAC could do." Thus, the representations that Plaintiffs rely on for their Complaint were superceded by the representations they relied on in executing the Modification. As such, there was absolutely no violation under subsection (v) as the characteristics of the Modification were just as Plaintiffs recognized them to be when they received the document as Ms. Barrett expressly made clear in that pre-execution conversation.

█ In addition to not being granted the loan modification on the terms that they believed were forthcoming, the Plaintiffs contend further UDAP violations occurred because GMAC did not refinance their obligation in one year as Ms. Barrett told them they could expect would happen. Their other complaint is that the monthly loan payment was increased almost immediately by $350 to account for escrow amounts. Neither of these circumstances present a violation under subsection (v). As stated above, the characteristics of the Modification were precisely what they were represented to be. The Plaintiffs were aware that the Modification did not contain a commitment to refinance in one year, having failed in their efforts to secure more than Ms. Barrett's word (which they had come to realize was a thin thread on which to hang their hopes). The plain language of the Modification states that the monthly payment of $2,077.01 consists of principal and interest only. A further provision reiterates the requirement under the Security Instrument that the borrower will comply with all other agreements to make all payments of, *inter alia,* escrow items. Thus, the increased total monthly payment to add the escrow amount did not evidence characteristics of the loan contrary to what had been represented to Plaintiffs in violation of subsection (v).

In order to determine whether GMAC's conduct violates the Catchall, I must first consider whether liability thereunder requires proof of the elements of common law fraud or something less. The extent of a consumer's burden under the UDAP Catchall was unsettled under Pennsylvania case law when I rendered my decision in *In re Patterson,* 263 B.R. 82 (Bankr. E.D.Pa.2001). Without Pennsylvania Supreme Court authority, I concluded that the 1996 amendment to the Catchall which added the words "or deceptive" after "fraudulent" expanded liability under that section of UDAP. I reasoned that to require proof of common law fraud as had been the case prior to the amendment would render the addition of the new language purposeless as it would be redundant. Given the remedial purpose of UDAP, a liberal interpretation seemed consistent with the statutory purpose of abating unfair and deceptive practices. *Id.* at 92. In the absence of Pennsylvania Supreme Court decisional authority, I interpreted the law as I believed it would do and found that a UDAP violation under the Catchall can result from "deceptive"

conduct.[13] A deceptive act is "the act of intentionally giving a false impression" or "a tort arising from a false representation made knowingly or recklessly with the intent that another person should detrimentally rely on it." Black's Law Dictionary at 413 (7th ed.1999).

Since my decision in *Patterson*, the Supreme Court has had occasion to construe UDAP's elements of proof. In *Weinberg v. Sun Company*, 565 Pa. 612, 777 A.2d 442 (2001), the Court held that in a private action (versus one commenced by the Attorney General) under UDAP, a plaintiff must establish reliance and causation. Speaking broadly of the statute's "underlying foundation [of] 'fraud prevention,'" the Court stated that "[n]othing in the legislative history [of UDAP] suggests that the legislature ever intended statutory language directed against consumer fraud to do away with the traditional common law elements of reliance and causation." *Id.* at 618, 777 A.2d at 446. However, it is clear that the Court was referring to the legislative history of the 1976 statute, and the Superior Court opinion makes clear that the *Weinberg* suit was commenced before the 1996 amendment to the Catchall. Thus, subsection (xxi) was not before the Court in its post–1996 form. Distinguishing *Weinberg* on those grounds, however,

is questionable because the analytical underpinnings of the decision are grounded in the language of 73 P.S. § 201–9.2, not the Catchall, and § 201.92 applies now, as it did then, to all UDAP actions by private parties. That provision, as quoted in *Weinberg*, states:

> (a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, *as a result of the use or employment by any person of a method, act or practice declared unlawful* by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. . . .

565 Pa. at 616, 777 A.2d at 445 (emphasis in original). The Court reasoned that the "as a result of" language requires that in a private action (as opposed to one commenced under § 201–4 by the Attorney General) a plaintiff must "suffer an ascertainable loss as a result of a defendant's prohibited action." *Id.* at 618, 777 A.2d at 446. The Court then went on to state "[t]hat means, in this case, a plaintiff must allege reliance. . . ." *Id.*

■ Causation and reliance are distinct elements of common law fraud. While as

---

**13.** In so holding I expressly refused to follow *Booze v. Allstate Ins. Co.*, 750 A.2d 877 (Pa.Super.2000) which I read to require proof of the essential elements of common law fraud in a UDAP action for violation of the Catchall. I noted in a footnote the *Booze* Court's awareness of the statutory change but failure to comment on its application in the case. *Patterson*, 263 B.R. at 92 n. 17. I surmised that one reason for the lack of analysis could be that the complained of conduct (which was not described in the opinion) occurred before the statutory change. Apparently that was the conclusion reached in a recent Court of Common Pleas Court decision which stated that *Booze* was based on the pre-amendment version of the Catchall. *Foultz v.*

*Erie Insurance Exchange*, 2002 WL 452115, at *11 (Pa.Com.Pl. March 13, 2002). While that fact was not apparent to me, it would indicate that the *Patterson* holding does not conflict with the view of the Superior Court at that juncture. However, more recently another Superior Court case, which this time does construe the post–1996 amendment language, again states that a plaintiff must prove all of the elements of common law fraud. Notably, however, in reaching that conclusion, it cites a pre-amendment case, *Skurnowicz v. Lucci*, 798 A.2d 788, 794 (Pa.Super.2002), and does not discuss the statutory change. Regrettably the lower appellate authority has not been enlightening on this unsettled question.

discussed below, it is still not clear that proof of reliance would be required under the post–1996 Catchall, the "as a result" language of § 2–01.92 expressly requires proof of causation. Since this provision has not changed, it is clear that proof of causation survives the statutory amendment to the Catchall. *Foultz v. Erie Insurance Exchange*, 2002 WL 452115 (Pa.Com.Pl. March 13, 2002); S. Goren, A Pothole on the Road to Recovery: Reliance and Private Class Actions under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 107 Dick. L.Rev. 1, 34 (2002). Thus, without regard to the element of reliance, all UDAP plaintiffs must prove they have "suffered an ascertainable loss as a result of prohibited action" of the defendant. *Weinberg, supra*, 565 Pa. at 618, 777 A.2d at 446. Stated another way, the Plaintiffs must establish that GMAC's violation of the statute caused their loss. *Weinberg, supra*, 740 A.2d at 1168. How then did the misrepresentations by GMAC cause Plaintiffs' loss? Plaintiffs' Complaint and Memorandum are notably vague in defining the required nexus between GMAC's conduct and the harm they have suffered as a result, and my examination of the evidence reveals none.

■ Plaintiffs entered into the Modification because they were in default of their loan agreement with GMAC and after an unsuccessful Chapter 13 case, were subject to impending foreclosure proceedings. The Plaintiffs accepted the Modification on terms they found to be unsatisfactory because their alternative was losing their home. While they were able to make the new increased payments for almost one year, Ms. Sheppard's serious illness compromised their ability to continue to perform. They advised GMAC of this development and their need for refinancing "now." The record is silent as to any follow-up by them after that telephone call.[14]

If the harm is that Plaintiffs entered into a bad loan agreement, *i.e.*, the Modification, it is clear that GMAC's conduct did not result in Plaintiffs' freely made decision to accept the Modification. Moreover, Plaintiffs were able to perform that agreement until circumstances changed with Mrs. Sheppard's illness. If the harm is that Plaintiffs were unable to perform the Modification and went into default, the cause was the reduced income resulting from that change of circumstance.[15] While complaining of the harm resulting from GMAC's refusal to refinance upon Plaintiffs' default, Plaintiffs have failed to connect the unrealized refinancing with the default of their loan.[16] A lender who refuses to refinance a defaulted loan (and there is no evidence of an application or refusal) has opted not to utilize its ability to prevent adverse consequences to its borrower. That is not the same as causing

---

**14.** The sole evidence on this issue is Mr. Sheppard's testimony that he contacted GMAC when his wife was diagnosed with cancer because of his concern that they would fall behind on payments. He indicated that he did not know whether his wife could continue to work, was going to be hospitalized or what the future held in store. GMAC was supposed to get back to him but the Sheppards were tied up with medical tests. If there was further discussion, Mr. Sheppard's testimony does not enlighten any further. There is no evidence that they applied for a refinancing or had one denied. Subsequently because of Mrs. Sheppard's health, they fell behind on their payments. J.Sheppard Dep. at 68–70.

**15.** Mrs. Sheppard was compelled to work part-time due to her health. J.Sheppard Dep. at 15.

**16.** The refinance discussed at the time of the Modification contemplated a reduction of interest to the then current rate. For example, there is no evidence that Plaintiffs were capable of performing a loan refinanced under such terms.

the harm. Where, as here, the Sheppard's financial resources had been compromised, it was that circumstance not the statement made the prior year to Mr. Sheppard by Ms. Barrett that the Modification would be refinanced that was the causative factor.[17]

▮ Having found that Plaintiffs cannot establish causation, a requirement

clearly surviving the 1996 Catchall amendment, I need not decide whether the *Weinberg* Court also found under § 201–9.2 that reliance must be established to sustain a UDAP claim.[18] However, given the unsettled nature of the law,[19] and even though not dispositive of the Motion, I have examined the parties' proofs on the issue of reliance and easily conclude that

17. Given the circumstances of Plaintiffs' second default (Mrs. Sheppard's illness) and their successful effort to keep up the Modification payments for almost one year, one would hope that GMAC would have entertained a request for some further relief from the monthly payment schedule. The record is silent as to whether an application was made or considered and whether one could be considered now in lieu of foreclosure. Plaintiffs' counsel, in his brief, has requested mediation which, as GMAC correctly notes in its Reply Memorandum, is not an available option to a properly presented summary judgment motion. Perhaps, however, with the legal claims against it no longer pending, GMAC may be more amenable to discussion about a further workout of this loan.

18. Reliance is an element distinct from causation yet the *Weinberg* Court appears to link the two together when it follows its pronouncement that the plaintiff must suffer a loss as a result of defendant's prohibited conduct by saying, "in this case, a plaintiff must allege reliance." However, does the reference to "in this case" mean that in some other case, reliance need not be proven? *Weinberg* was an appeal of the denial of certification for a class of consumers alleging violations of various provisions of UDAP. Finding reliance and causation necessary elements of all of the claims pled (fraud and false advertising), the Court concluded that the questions of fact applicable to each plaintiff would be numerous and extensive so as to foreclose class treatment. Does "in this case" mean in a class action? Or does it mean the specific claims pled, which "in this case" included the Catchall. Given the Supreme Court's reversal of the Superior Court's holding that reliance need not be proven in connection with the non-fraud based allegations (*i.e.,* false advertising) as opposed to the fraud-based ones (*i.e.,* the Catchall), it would appear that "in this case" does not refer to the distinction between specific UDAP viola-

tions alleged since the Supreme Court held that all the claims were subject to the same proofs.

19. Until the Pennsylvania Supreme Court decides a case under the 1996 Catchall amendment, the law will likely remain unsettled. Post-*Weinberg* cases to date have not been helpful. In *Grant v. Kingswood Apartments*, 2001 WL 1876343 (E.D.Pa. October 15, 2001), the Court followed *Weinberg* in granting a motion to dismiss where allegations of common law fraud had not been pled in support of the UDAP claim. However, the Court stated that it was not clear whether the plaintiffs had pled a claim under the Catchall and assumed for the purposes of the motion that violations based on breach of warranty of habitability and false advertising were alleged. *Id.* at *3 n. 1. In *Debbs v. Chrysler Corp.,* 810 A.2d 137, 154–58 (Pa.Super.Ct.2002), the Court followed *Weinberg* in requiring reliance to be proven on a post-amendment Catchall claim but like *Weinberg*, the case also focused on class certification. Several post-*Weinberg* cases follow my analysis in *Patterson* but do not address the intervening Supreme Court decision in *Weinberg*. *Flores v. Shapiro & Kreisman*, 246 F.Supp.2d 427 (E.D.Pa.2002); *Commonwealth v. Percudani*, 825 A.2d 743 (Pa.Cmwlth.2003). The only case to address the issue head on is *Foultz, supra,* a thoughtful decision of a Pennsylvania trial court that recognizes *Weinberg* but notes, as I have done, that no appellate court has yet addressed the 1996 amendment to the Catchall. With the amendment in mind, it concludes for the same reasons that I did in *Patterson* that each element of common law fraud, including reliance need not be proven. In so stating, it notes that the amendment did not affect the causation requirement of section 9.2, and thus plaintiffs must plead that they "suffered harm as a result of the defendant's deceptive conduct."

there is no disputed fact that would allow this Complaint to survive summary judgment if reliance is an element of a UDAP Catchall claim. As noted above, there was no reliance on the statements made by Ms. Barrett about loan modification terms different than the ones offered because the earlier statements were superceded by the actual Modification that was presented as "the best GMAC could do" and those terms were subsequently, albeit unhappily, accepted. Nor did Plaintiffs enter into the Modification in reliance on Ms. Barrett's statement that the agreement would be for one year at which point GMAC would refinance the whole mortgage and "probably lower your rate to whatever the current rates are." J. Sheppard Dep. at 62. Rather the Modification was signed because the alternative, foreclosure of their residence, was more egregious. Moreover, Mr. Sheppard's reaction and response to Ms. Barrett's statement about a future new loan undermines any contention that Plaintiffs relied on a future refinancing by GMAC. Wary of Ms. Barrett's promises because of her failure to deliver a Modification on the terms they had discussed, Mr. Sheppard asked for some assurance or guarantee of a refinancing in one year. She responded to his question as to why the refinancing provision was not included in the Modification with reasons that Mr. Sheppard testified were a "gobbledygook excuse." J. Sheppard Dep. at 63. When pressed, she replied that their only assurance was her word which he stated was at that point "untrustworthy." *Id.* at 53–54. He found the conversation of great concern with his faith in Ms. Barrett diminishing "as every second ticked along." *Id.* at 77. In that conversation he learned that she had never done a modification transaction before, requiring a great deal of assistance in the matter. Indeed in that phone conversation, Ms. Barrett was unable to respond to Mr. Sheppard's questions placing him on hold and conferring with some third party before responding. Based on Ms. Barrett's failure to include a commitment to refinance in the Modification of which Mr. Sheppard was aware, her inability to deliver terms that she had discussed with them previously and to answer questions without consultation and Mr. Sheppard's acknowledgment that he did not view a future refinancing as guaranteed to occur, Plaintiffs clearly did not rely on representations GMAC made about what would happen in the future with the loan.

## CONCLUSION

GMAC has met its burden of proof by showing that it would be entitled to a directed verdict at trial. It has done so using only the Modification, attached to the Complaint, and Plaintiffs' own testimony. Plaintiffs' have failed to demonstrate that there is an issue of fact that would support a contrary result. The Modification on its face does not satisfy and replace the Original Loan, a fact conceded by Plaintiffs. As such, it does not meet Regulation Z's definition of a refinancing, additional disclosures were not required, and Plaintiffs had no right to rescind under TILA. Nor does Pennsylvania's UDAP provide the vehicle for Plaintiffs' relief from the burdensome agreement that they voluntarily entered. Having agreed to that modification in August 2000, they have been able to retain their home which was in danger of foreclosure. Their acceptance of the terms of the Modification reflects their lack of leverage with GMAC not misrepresentations about the terms of the Modification. While the law may be unsettled as to whether proof of all elements of common law fraud are necessary to sustain a claim under UDAP's Catchall, the Pennsylvania Supreme Court has made it clear that causation must always

be established. There is no question of fact that it cannot be proven here. GMAC is therefore entitled to summary judgment on all counts of the Complaint.

An Order consistent with this Opinion shall be entered.

## ORDER

**AND NOW,** this 6th day of October 2003, upon consideration of the motion of GMAC Mortgage Corp. ("GMAC"), for summary judgment (the "Motion"), and for the reasons stated in the accompanying Memorandum Opinion, the Motion is **GRANTED.**

It is hereby **ORDERED** that Judgment is entered in favor of GMAC and against the Plaintiffs on all counts of the Complaint.